Good morning, Your Honors. My name is Barbara Litchman for the City of Las Vegas and other petitioners. And at the outset, if it pleases the Court, we would like to reserve three minutes for rebuttal. But you'll have to help us keep track. Yes, Your Honor. Okay. This case is not about the crime. It's about the cover-up. About the what? The cover-up. The cover-up is the FAA's failure to disclose the environmental impact of several critical aspects of its new departure procedure off the west end of the runways at Las Vegas. It's a failure that the FAA justified by saying, and I am reading from Petitioner's motion to supplement the administrative record at page 7, they failed to disclose because the disclosure would have the mayor, the residents, the city council, the congressional delegates, coming out of the woodwork asking why we lied to them about the procedure. Now, two notable failures stand out in this failure to disclose. The first is the complete failure to disclose the existence of a waiver from the requirements of FAA Order 8260.44A, which designates the safe leg lengths or distances between waypoints on certain procedures. They didn't disclose it to the public in the draft supplemental environmental assessment, in the final supplemental environmental assessment, nor in the record of decision. What fact did they not disclose other than that they had applied for a waiver internally within the FAA? What fact did they fail to disclose? Is that the question, Your Honor? Other than the fact that they had applied for a waiver. They failed to disclose that they needed a waiver, that the existing distances between the leg lengths that they reported in the environmental documentation were not in fact safe by their own standards, and they failed to evaluate what might happen if those leg lengths were changed with respect to where the aircraft would fly, the potential shift in noise impact, and the potential for certain other air quality impacts. It's very technical with respect to that particular item. So that is what they failed to disclose entirely, the entire spectrum, not only the fact of the waiver. They didn't disclose the fact that there would be a change in the flight pattern? No. They didn't disclose that there would have to be a waiver of safety requirements to allow that to happen? Yes. I understand they didn't disclose that there would have to be, they would have to get the consent of another part of the FAA. That's correct. And the import of the lack of safety in the distance as were reported in the environmental documents. And not only did the FAA fail to report this, but they affirmatively stated and misled the public in the final supplemental environmental assessment where they said that a new modified procedure would solve the problem, when in fact that modified procedure was the addition of another waypoint which shortened the distances even more and which didn't have a waiver either. And, Your Honor, if they really didn't need a waiver as they claimed, why did they get one two months later? That's a rhetorical question that we're asking ourselves as well. So the waiver had tremendous impact on the public because they had a right to know in response to a comment concerning safety that there were going to be safety impacts unless a waiver was granted and no waiver was ever granted. So that's one very important aspect. Well, it's not true that no waiver was ever granted. During the term before the law. No waiver was granted before the issuance of the FOMC. That is correct, Your Honor. But there was a waiver granted. Yes, but the public never got a chance to comment on it, never got a chance to review it. Well, is there any, if they had just gone and gotten the waiver in advance, would you have had a right to comment on that waiver application from one part of the FAA to another? If they had disclosed it, the public would have been able to comment. Are they required to disclose it? Yes, Your Honor, because even if, for argument's sake, NEPA didn't require that such a thing be disclosed with regard to, for instance, noise impacts, there was a specific question in the response to comments in the final supplemental environmental assessment that asked about safety. Suppose six months before this, they had gone and gotten a waiver from whichever part, whichever section of the FAA it is. The one section had gone to the other and said we want a waiver. Would they have had to report that to the public in advance? We believe they would, Your Honor. Anything that has to do with the construction of this procedure would have had to be And in this case, the waiver did, because the FAA defends itself by saying that the consulting firm, Landrum and Brown, knew about the waiver and took it into consideration when it formed the procedure. But, Your Honor, the issue here is that the public was never given a chance to review that so-called evaluation by the consultant. We don't know if it ever happened. We don't know what it said. We don't know if the consultant came to the conclusion that it didn't make a noise impact or it did make a noise impact. And NEPA requires the most fundamental basis of NEPA, as this Court has said countless occasions, is the public's right to know what the agency is doing, to comment on it. Nothing in NEPA says you have to change, the agency has to change its position. But at least the public has to be able to see what the agency is doing and comment on the potential impact. In this case, the public was not given that opportunity. Ginsburg. Let me ask a question. Could, during the administrative proceeding, could the city have objected to the no-action alternative and statement of purpose and needs during the proceeding because the city was included in the DSEA? If so, didn't the city, if it failed to, didn't it fail to exhaust its objection by failing to raise it during the administrative proceeding? Well, Your Honor, in our view, the city would have had to be a mind reader because with respect to the waiver itself, if we are concentrating on that, it had no idea, nor did it have the obligation to know what the FAA's regulations were, had no idea that a waiver was going to be required during the administrative proceeding. It was never mentioned in any of the documents. Now, the FAA will tell you that there was a modified procedure that was mentioned, that there was a procedure package that was mentioned, various euphemisms, but the word waiver of safety requirements was never mentioned, and the modified required the waiver. It was an additional waypoint which itself required a waiver, a new waiver, which they eventually received. So we have a safety problem here that was never disclosed to the public. And a potential noise impact. How exactly does that violate NEPA? Well, for two reasons. One, the safety problem gives rise to potential noise impacts because to the extent that this waiver caused a change in the flight paths, the noise impacts had the potential for changing. We don't know if they did or didn't. So that the, okay, so the major government action that would require an impact statement was. That's right. What? That's correct. Was, but was, and it has to be disclosed. Correct. In order to get comment on. Correct, Your Honor. Was the potential noise impact, I mean, that was a part of it? That was. Is that the idea? One aspect. Yes. The other aspect is, as you are well aware, this Court has, again, found on many occasions, when there is a question posed by the public and is responded to in the final supplemental, it has to be full and truthful disclosure. The public asked a safety question specifically, is this procedure safe? They said, don't worry. The modified procedure will make it safe. The modified procedure was not the waiver. The modified procedure was the addition of another waypoint. That itself was at that moment unsafe. So there was never a response to the comments the public was entitled to. But there's another aspect here of failure to disclose, which I'd like to touch on, and that is the failure to disclose the air quality impacts of the project to the public. Eventually, in the final supplemental environmental assessment, which was published the same day as the final agency order, in that there was an air quality applicability analysis, which the public similarly had no opportunity to look at. And the FAA will tell you that it doesn't really matter, that we told you there was an exemption in the draft. But the draft, we commented and objected to the exemption from the conformity regulations. We commented on that extensively. In the final, they said, well, we gave you the final, we published the final for comments. But this Court has stated, as recently as 2007, that, quote, and this is in Sierra Club v. Bosworth, post-decision information may not be advanced as a new rationalization for sustaining or attacking an agency decision. The FAA says, well, we finally came up with a presumed to conform rule, which would have created a presumption of conformity, so don't worry. But you can't use a presumed to conform rule that wasn't in existence until February 2007 to justify a decision that was made in November 2006. So there are two aspects, the absence of comment or the absence of disclosure of the waiver, the absence of disclosure of clean air conformity. And I will retain, reserve the remainder of my time for rebuttal, if it pleases the Court. Thank you. May it please the Court. Lane McFadden for the United States Department of Transportation and the Federal Respondents. I suppose I, too, will focus on the waiver issue, as the Petitioners have asked this Court to think primarily about that. But I would like first to address the fact that many of these questions, including the question of the extent to which FAA's internal waiver process has to be discussed in a NEPA document, are all issues that Petitioners have not yet exhausted. 46-110d, which is the jurisdictional statute on which they appear before you today, requires that any issues that you bring in a petition for review must first be raised in a proceeding before the administrator. And FAA would consider that to be comments on the draft that would qualify or in a request for a stay, which Petitioners did file, but the request for a stay simply says we ask you to stay this procedure because it violates NEPA without indicating any specific issues of any type. And the specificity with which they believe the final document violated NEPA never appeared until argument before this Court in the motions and in the briefs. And that is too late by terms of 49 U.S.C. 46-110d, which is the statute that controls here. That said, I'll address the merits of the question of the extent to which FAA's internal decision-making process has to be disclosed in the final documents or in any of the NEPA documents. Although Petitioners dismiss it out of hand, it is clearly the fact that the departure procedure that was reviewed in the environmental documents was the departure procedure that was ultimately approved as part of the waiver package and the departure procedure that was implemented. So NEPA's obligation that it places on FAA is to review the Federal action that it intends to take and to disclose the environmental impacts of that. And it's done so. It's indicated in Excerpts of Record 103, the final supplemental environmental assessment talks about the specifics of how this modification was necessary. And in the response to comments, which is at supplemental excerpts, page 214, there is further discussion of the specific need for a change from the general design criteria. And at this point, I want to respond specifically to a claim made by Petitioner, which is also implied in their briefs. She today described this at least once as a waiver of FAA's safety requirements. And that is not at all what happened in this case. What was waived was the general design criteria, which are established nationwide as a generic baseline for how you determine what RNAV departure procedures should look like. It includes things like one waypoint to another should be at a minimum distance. The minimum distance varies depending on how sharply you're turning. These are all sort of calculated by air safety specialists to establish what is safe. The waiver that occurred was not merely an internal FAA decision that, well, we won't comply with those criteria. It was, instead, a decision established by FAA order and a decision made quite possible. I mean, we asked how often these types of waivers are given, and they said we get about a dozen every couple of months. There is an agency or an office within the agency that considers these. It's a relatively common practice. The decision must be made within FAA that the new procedure, whatever it is, that does not meet the general design criteria, must meet an equivalent level of safety. And that has to be demonstrated. What did the waiver allow you to do that would have any effect that was not disclosed when you disclosed what you were going to do? Nothing, Your Honor, because when we disclosed the flight path we were studying in the environmental documents, that was the flight path that ultimately the waiver approved. So when the environmental documents came out, the environmental documents studied a departure procedure that wasn't consistent with the general design criteria and hadn't yet been decided that it was going to be okay because the safety analysis that FAA conducts is independent of and in addition to its environmental review. It does the NEPA-required process, but it does additional testing on safety. And that was what took until January of the following year before FAA was convinced that it would meet an equivalent level of safety. Yeah. Well, let me just ask you on the most elementary basis as a frequent flyer. Las Vegas is a city that has grown incredibly. And as I understand it, one of the reasons for this was that it became the fifth busiest airport in the country, which means that there were a lot more planes taking off than there were when the plan that was changed was instituted, where everybody turned left or away from the city. Okay. Now, because it's the fifth busiest airport in the country, we get delays and concerns about backups and complaints and everything, right? So the FAA says we'll change the flight pattern so that we don't have all the planes turning away from the city. We'll have a third of them turning toward the city. Is that right? Well, that wasn't the reason, but that's the outcome, essentially, yes. It's they said we'll stop having all the planes turn so that they all meet. The planes departing off different runways under the four-corner post plan, one turns left and one turns right, and then they meet at a point south of the city, which is what causes the delay. Right. Because you have to have spacing between the planes. You have to wait for one to take off. You have to wait a certain period of time before you can let another one take off. Right. So the departure procedure, the new departure procedure that we're talking about here today, lets a third of the planes, and I'm sorry, I'm doing this from my perspective, but if you're departing to the west, you turn right, you go north, and that means you avoid this meeting point down south of the airport. You avoid the meeting point, but it causes the planes to come back over the city. That's right. And the question is whether or not this, I mean, ultimately under the NEPA, as I understand it, the question is whether this is major action that requires a full analysis of the environmental impact. And the FAA decided that it wasn't, and that you could do an assessment because there were not major, well, you explain. Give me the proper wording. The decision was made that it did, in fact, require an environmental assessment. It was sufficiently major Federal action. And then the environmental assessment process determines whether there's a significant environmental impact. That's the triggering phrase, which would then require an environmental impact statement, which is a much more thorough review. And the assessment determined that it did not result in a significant impact. Correct. Environmental impact. So the ultimate question is whether that determination, that there was no significant environmental impact, was arbitrary and capricious. And that's the NEPA inquiry on these documents. Right. And is safety a part of that? It is not typically part of that. No. No. And the FAA, which is why in the FAA's decision-making process, it's treated separately a lot of times. Right. So that may be part of the problem here. Okay. Yes. In fact. So what we have is the assessment of noise and of air quality. Air quality. Yes. Exactly. And on those points, again, there are a number of ambiguities in the way that data is presented that the Petitioners have alleged. They say, well, we don't understand how one table relates to another or how these two maps might be compared. But they don't actually suggest, they don't present any evidence to suggest that the conclusions were incorrect, which is understandable because all the evidence before the agency was consistent. And we describe in some detail in the brief, and I'll be happy to go into it if the Court has questions, how the noise methodology works and how the air quality methodology works. But these questions were treated fully. And especially in their argument that the air quality conditions were covered up and that we didn't want to disclose them, sort of belied by the fact that the FAA, in excess of what it's required to do by CEQ regulations, published a draft of this document in which they said this procedure is exempted from air quality analysis by the EPA. And commenters, including some of these Petitioners, submitted comments that said, no, we want to see an air quality analysis that is specific to this airport and specific to this procedure. And the FAA provided just that in the final documents. It was fully responsive to comments and provided evidence, actual evidence, that, in fact, under the proposed action, emissions would go down, because delays would decrease, planes would spend less time idling and taxiing on the runway. Ginsburg. And it was the delays and the stack-up problem that was causing the emissions. Right. It's when you're in the plane waiting to take off and the engines are running that the air emissions on the ground are happening and you're getting the worst of the adverse air quality emissions. So reducing those reduces those. That's disclosed fully in the environmental assessment. And the only challenge to that the Petitioners bring here is that, well, we didn't have an opportunity to comment on that, which, again, is in excess of what the agency is required to do in the environmental assessment process under NEPA, even under this Court's case law and certainly under the CEQ regulations, and also belied by the fact that the documents themselves solicited comments, the notice of availability said it's available for comment. They certainly could have submitted comments and didn't do so. They could have then raised it in the proceeding, which they filed with the agency after they sued us in court. They had an opportunity to raise it there, didn't take that opportunity. So it's difficult to know what the actual objection to air quality analysis is. The conclusion is clear that emissions would decrease. And under any interpretation of the Clean Air Act, if you're decreasing emissions, you haven't violated the State implementation plan that governs and you don't need to do any further Clean Air Act analysis. Ginsburg. In the supplemental excerpt of record in 214, it said the modified procedure would maintain an equivalent level of safety under varying conditions. In fact, the proposed path was still not pliable until the flight technologies and procedures division of the FAA approved the waiver. Is that correct? That's correct, Your Honor. Even after the FONSI and the record of decision was issued, FAA couldn't actually publish these procedures and allow pilots to fly them until it had had the waiver approved and had completed safety testing. It seems to me this assurance of safety for the proposed flight path stood in contrast to the FAA's explanation that it rejected another alternative in part because it violated the flight procedure's planning rules. Is that correct? Well, the procedures that the alternatives that were rejected, some of them did violate the planning rules, but they were all also evaluated for their consistency with the purpose and need, and they were rejected for one reason or another because they didn't comply with the need to reduce delay and increase efficiency. So there were other reasons in addition to not complying with the planning criteria that occurred in rejecting those alternatives. All right. Unless the Court has any further questions, I believe that covers it. Thank you. Thank you, Your Honor. I believe the petition for review should be denied. I want to thank you, Your Honor, for locating the very quote that I was going to use. Number one, waiver is a safety issue. Not can't be passed off as a mere noise issue, and noise is not insignificant either, but in regard to your question as to whether this is a NEPA requirement, there is no safety category in NEPA because most agencies don't have that obligation. However, where there is a comment, the agency has the duty and obligation to answer that comment truthfully, and there was a comment, comment F1, that's in the supplement to the administrative, to the excerpts of record, page 180, in which the FAA did say precisely what Your Honor read, that this is an issue of safe flying environment. So we can put that away right now. The issue here, cutting to the chase, is failure to disclose and allow the public to review. And this Court has said repeatedly, bearing straight, is a recent case of this Court in which the Court said, and it's 524F3938, in 2007, an agency, when preparing an EA, must provide the public with sufficient environmental information considered in the totality of the circumstances to permit members of the public to weigh in with their views and thus inform the agency decision-making process. That's a fundamental obligation of NEPA. And the fact that the citizens here did not have the opportunity to review and comment until the FAA says, after the record of decision was signed, this Court has said again, as I said earlier, and I won't bore you with the quote, that an after-the-fact comment period does not suffice to meet the obligations of NEPA. So from that perspective, the FAA failed. Now ---- Wait. So what's our strongest case here that supports you? Strongest case, failure to disclose and allow comment on a minimum of the safety issues surrounding the waiver and the air quality issues. Now, the air quality ---- I do understand that. I'm sorry. I'm just asking you, in our cases that have interpreted NEPA, what is the law that is most favorable to your position here, that you most rely on? Well, as I just quoted, bearing straight requires comments. Yes. Shall I ---- would you like the cite again? You read it fast. 524, 538 what? 938. Okay. That's your decision in 2007. Navajo Nation, 479 F3rd 1024 at 1049, Ninth Circuit, 2007. Plaintiffs have exhausted their administrative appeals if the appeal taken as a whole provided sufficient notice to the agency to afford it the opportunity to rectify its violations. Well, clearly, it had the opportunity on the waiver and didn't do it. And with respect to air quality, and I would point the Court to the fact that air quality conformity is both a procedural and a substantive requirement, and the fact that they did it late in the process so that the public never got to see the results of that study before it was finalized. So your position is that you should have been notified when that there was going to be a waiver sought, and so that you would have an opportunity to go to the FAA and say don't grant the waiver? That's correct, Your Honor. Okay. And certainly with air quality, we should have been informed that there was not an exemption, which turned out to be the case, both by the EPA's admission and the FAA's admission, that there was no applicability of the later enacted presumed to conform rule, which is currently under challenge in the D.C. Circuit, and that the conformity applicability analysis, which may be perfectly appropriate and perfectly adequate, was never shown to the public. Thank you, Your Honors, for this opportunity. The Court appreciates the quality of argument presented on both sides of the matter and it is submitted for decision. We'll hear the last case for argument this morning, which is Marta Saeed Ahmed v. Mukasey.
judges: Schroeder, Nelson, Reinhardt